# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| DANIELLE KITCHIN, ) <br> Co-Personal Representative ) <br> and Heir of the Estate of ) <br> Dana A. Kitchin, et al., ) <br> ) <br>     Plaintiffs, ) <br> ) <br>            v. )   1:18-cv-00356-JDL <br> ) <br> RANDALL LIBERTY, ) <br> in His Individual and Official ) <br> Capacity as Sheriff of Kennebec ) <br> County, et al., ) <br> ) <br>     Defendants. ) | |

## ORDER ON CORRECTIONAL HEALTH PARTNERS, LLC AND JENNIFER MIX'S MOTION TO DISMISS

The Plaintiffs, Danielle Kitchin and Dana B. Kitchin (collectively, "the Kitchins"), bring this suit on behalf of the estate of their father, Dana A. Kitchin, for claims arising out of his death while he was in pretrial custody at the Kennebec County Correctional Facility. Two of the Defendants, Correctional Health Partners, LLC, and Jennifer Mix (collectively, "the CHP Defendants"), move to dismiss eight of the claims asserted against them in the First Amended Complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) (ECF No. 24).[1] For the reasons discussed below, I grant in part and deny in part the motion to dismiss.

---

[1] The CHP Defendants also assert in their reply brief that a ninth claim, the Section 1983 claim in Count Four, must be dismissed because it is subsumed by more specific constitutional claims in the First Amended Complaint. ECF No. 36 at 1. Because arguments raised for the first time in a reply brief are not properly before the Court, I do not reach the issue here. *See Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 349 (D. Mass. 2010); *Wills v. Brown Univ.*, 184 F.3d 20, 27 (1st Cir. 1999). The CHP Defendants raise the same

## I. FACTUAL BACKGROUND

The First Amended Complaint alleges the following facts, which I treat as true for purposes of the motion to dismiss.

Correctional Health Partners, LLC is a for-profit company and a private independent contractor that "provides medical services" to inmates at the Kennebec County Correctional Facility ("KCCF"). ECF No. 4 ¶¶ 29-30. Correctional Health Partners "is responsible for healthcare at KCCF" and "makes medical decisions for inmates" at KCCF "as to whether they are allowed access to certain medical procedures." *Id.* ¶¶ 31, 33. Jennifer Mix, D.O., ("Mix") is the Chief Medical Officer of Correctional Health Partners. As Chief Medical Officer, Mix leads Correctional Health Partners' team of correctional medical directors, nurses, and physicians and has overall responsibility for its clinical programs. *Id.* ¶ 36.

On December 10, 2014, Dana A. Kitchin ("Kitchin") was detained at KCCF on misdemeanor charges. He was 64 years old at the time. Kitchin was held in a cell located in the intake area of KCCF, where inmates are subject to constant supervision, including checks every fifteen minutes. Staff members at KCCF were familiar with Kitchin because he had been frequently incarcerated for minor violations. When inmates are admitted to KCCF, they are screened for mental and physical health conditions; therefore, KCCF was aware that Kitchin had physical and mental health issues.

argument in response to the Kitchins' Motion to Amend (ECF No. 39), which was filed after briefing on the instant motion to dismiss concluded, and, therefore, the argument will be considered in that context. *See* ECF No. 43 at 3.

On December 11, the day after he arrived at KCCF, Kitchin began banging on his cell door and calling out for help from corrections and medical staff. Another inmate, who was being held in a cell in the intake area two doors down from Kitchin's, heard Kitchin banging and knocking on his cell door, for about seven or eight hours, and asking to be seen by a nurse and to go to the hospital. He also heard Kitchin shouting that his chest hurt. The corrections officers told the inmate that Kitchin "always acts like this and that's why they ignore him." ECF No. 4 ¶ 61. During this time, the inmate did not see any KCCF staff members perform the mandatory fifteen-minute checks on Kitchin. A second inmate who was being held in the intake area also heard Kitchin banging on his cell door and screaming for help. He did see a nurse go to the door of Kitchin's cell and heard Kitchin ask her for medical attention and to be taken to the hospital, but the nurse never entered Kitchin's cell and Kitchin was not taken to the hospital.

On December 12, Kitchin was found dead in his cell. An autopsy performed two days later determined that Kitchin had suffered from a "[m]assive hemoperitoneum due to [a] ruptured spleen." *Id.* ¶ 80. The First Amended Complaint alleges that the staff at KCCF knew that Kitchin suffered from mental illness, that they ignored his cries for help because they found him to be a nuisance, and that, as a result of their alleged inaction, Kitchin bled to death internally over a period of many hours.

## II. LEGAL ANALYSIS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). A two-pronged approach is employed to resolve a motion to dismiss. *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). I first "isolate and ignore statements in the complaint that simply offer legal labels and conclusions," and second, take the remaining well-pled facts as true, "drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). In other words, the question is whether the well-pled facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The CHP Defendants argue that eight of the counts in the complaint—Counts Five, Six, Seven, Eight, Nine, Ten, Eleven, and Twelve—should be dismissed for failure to state a claim upon which relief can be granted under Rule 12(b)(6). In their response, the Kitchins agree to dismiss several of the claims challenged by the CHP Defendants. First, the Kitchins agree to dismiss the substantive due process claim in Count Nine, which the CHP Defendants argue is subsumed by the more specific constitutional claims in Counts One, Two, and Three. ECF No. 24 at 12-13; ECF No. 35 at 3 n.3. Second, the Kitchins also agree to dismiss Count Twelve, for punitive damages, as a stand-alone cause of action, explaining that they will pursue punitive damages as set out in the Prayer for Relief in the First Amended Complaint. ECF No. 35 at 13. Finally, the Kitchins agree to dismiss the Americans with Disabilities

Act claims in Counts Ten and Eleven as against Mix only, but not as against Correctional Health Partners. *Id.* at 14 n.7.

Therefore, my analysis will focus on the remaining counts. I first turn to the CHP Defendants' argument that the state common law claims in the First Amended Complaint—Counts Five, Six, Seven, and Eight—are barred under the Maine Health Security Act's three-year statute of limitations. Because I conclude that the state common law claims are not subject to the Maine Health Security Act, I then address the CHP Defendants' argument that Counts Six and Seven are barred under the Maine Wrongful Death Act's two-year statute of limitations. Finally, I turn to the CHP Defendants' argument that Counts Ten and Eleven of the First Amended Complaint fail to state a claim against Correctional Health Partners under Title II of the Americans with Disabilities Act.

**A.     The Maine Health Security Act**

The CHP Defendants first argue that the Kitchins' state common law claims for negligent supervision, retention, and training (Count Five); intentional infliction of emotional distress (Count Six); "Survivor Claims" (Count Seven); and respondeat superior (Count Eight) are subject to the Maine Health Security Act ("MHSA"), 24 M.R.S.A. § 2501 *et seq.* (Westlaw through Ch. 112, and 114 to 169 of 2019 1st Reg. Sess. of 129th Leg.), because they arise out of an alleged failure to provide medical services. As a result, the CHP Defendants contend that: (1) the Kitchins were required to exhaust the MHSA's prelitigation screening panel process, which they failed to do; and (2) even if they had done so, the claims are barred by the MHSA's three-year statute of limitations. *See* 24 M.R.S.A. §§ 2902, 2903. The Kitchins

respond that their claims are not subject to the MHSA because they are not "action[s] for professional negligence," Correctional Health Partners is not a "health care provider," and Mix is not a "health care practitioner," as those terms are defined by the MHSA. *See* 24 M.R.S.A. § 2502.

The MHSA requires that a plaintiff comply with certain prelitigation screening requirements before commencing an "action for professional negligence," and that such an action be brought within three years after the cause of action accrues. 24 M.R.S.A. §§ 2902, 2903. The MHSA defines an "action for professional negligence" as "any action for damages for injury or death against any health care provider, its agents or employees, or health care practitioner, his agents or employees, whether based upon tort or breach of contract or otherwise, arising out of the provision or failure to provide health care services." 24 M.R.S.A. § 2502(6). The MHSA is generally interpreted broadly. *D.S. v. Spurwink Servs., Inc.*, 65 A.3d 1196, 1202 (Me. 2013); *see also Saunders v. Tisher*, 902 A.2d 830, 833 (Me. 2006) (a claim "need not be one of negligence" to be subject to the MHSA); *Butler v. Killoran*, 714 A.2d 129, 132 (Me. 1998) (collecting cases) (explaining that the "procedural requirements and limitations period" of the MHSA are "applicable in a wide variety of contexts").

The MHSA's definition of "action for professional negligence," though expansive, thus has three constituent parts that must be satisfied: (1) an action for damages for injury or death, whether based upon tort or breach of contract or otherwise; (2) brought against a health care provider or practitioner, or the agent or employee of a health care provider or practitioner; (3) that arises out of the provision or failure to provide health care services. *See* 24 M.R.S.A. § 2502(6). Here, although

6

the state common law claims asserted in the First Amended Complaint meet the first and third requirements—they seek to recover damages for Kitchin's death and allege that his death was caused by the CHP Defendants' failure to provide him with health care services—they do not meet the second requirement.

Whether the second requirement is met depends upon whether Correctional Health Partners and Mix qualify as a health care provider and health care practitioner, respectively, under the MHSA. If Correctional Health Partners qualifies as a "health care provider" under the MHSA, the claims against both Correctional Health Partners and Mix are subject to the MHSA because Mix would then qualify as an employee of a health care provider. 24 M.R.S.A. § 2502(6); ECF No. 4 ¶ 35. The MHSA defines "health care provider" as:

> any hospital, clinic, nursing home or other facility in which skilled nursing care or medical services are prescribed by or performed under the general direction of persons licensed to practice medicine, dentistry, podiatry or surgery in this State and that is licensed or otherwise authorized by the laws of this State.

24 M.R.S.A. § 2502(2). The CHP Defendants argue that Correctional Health Partners is a "health care provider" under the MHSA because the company "and its medical providers run the medical clinic at the Kennebec County Correctional Facility." ECF No. 36 at 2.

Although the First Amended complaint alleges that Correctional Health Partners "provides healthcare services to inmates" and "makes medical decisions for inmates" at KCCF, ECF No. 4 ¶¶ 30-31, it does not allege that those "medical services are prescribed by or performed under the general direction of persons licensed to practice medicine" in Maine, as required by the MHSA. 24 M.R.S.A. § 2502(2). At

the motion to dismiss stage, I must consider the allegations in the First Amended Complaint in the light most favorable to the Kitchins and draw all inferences in their favor. *Schatz*, 669 F.3d at 55. The First Amended Complaint alleges that Mix leads Correctional Health Partners' team of correctional medical directors, nurses and physicians. ECF No. 4 ¶ 36. It does not, however, allege that Mix was licensed to practice medicine in Maine during the relevant time period, and does not mention any other licensed physicians employed by Correctional Health Partners who were directing the provision of medical services at KCCF. Thus, I conclude that Correctional Health Partners is not a "health care provider" under the MHSA.[2]

I next consider whether Mix is a "health care practitioner" as that term is defined in the MHSA. "'Health care practitioner' means physicians and all others certified, registered or licensed in the healing arts[.]" 24 M.R.S.A. § 2502(1-A). A "physician" is "any natural person authorized by law to practice medicine, [or] osteopathic medicine . . . within this State." § 2502(3). The Kitchins assert, and the CHP Defendants concede, that Mix was not licensed to practice medicine in Maine at the time of Kitchin's death.[3] Setting that addition aside, the First Amended Complaint does not allege that Mix was licensed to practice medicine in Maine (or

---

[2] The CHP Defendants also point to several District of Maine cases to support the argument that Correctional Health Partners qualifies as a "health care provider," but those cases are all distinguishable. In two of the cases, the plaintiffs did not dispute that the MHSA applied to the challenged claims, *see Little v. Tall*, 195 F. Supp. 2d 199, 201 (D. Me. 2002); *Ferris v. Cty. of Kennebec*, 44 F. Supp. 2d 62, 66 (D. Me. 1999), and in the third the plaintiff voluntarily dismissed the challenged claims, *see Belskis v. State of Me. Bd. of Correction*, No. 1:15-cv-00091-JAW, 2015 WL 5995267, at *8 (D. Me. Oct. 14, 2015). Therefore, in those cases the court had no occasion to analyze whether the defendant companies qualified as "health care providers" under the MHSA.

[3] In an affidavit submitted with the CHP Defendants' Reply to the Motion to Dismiss, Mix concedes that she did not become licensed to practice medicine in Maine until March 2015. ECF No. 36-1 ¶ 6. Because courts may consider only the complaint, matters fairly incorporated within the complaint, and matters susceptible to judicial notice in resolving a motion to dismiss under Rule 12(b)(6), *Zenon v. Guzman*, No. 18-1119, 2019 WL 2119627, at *4 (1st Cir. May 15, 2019) (quoting *Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)), I do not rely upon this concession in my analysis.

8

anywhere else) during the relevant time period. Therefore, viewing the allegations in the First Amended Complaint in the light most favorable to the Kitchins as the nonmoving party, I conclude that Mix does not qualify as a "health care practitioner" under the MHSA.

Because I conclude that Correctional Health Partners and Mix do not fall within the MHSA's definitions of "health care provider" and "health care practitioner," respectively, the common law claims in the First Amended Complaint (Counts Five, Six, Seven, and Eight) are not "action[s] for professional negligence" under the MHSA. *See* 24 M.R.S.A. §§ 2502(6), 2903. Therefore, the claims are not subject to dismissal for failure to comply with the MHSA's prelitigation screening requirements.

**B.     The Wrongful Death Act**

The CHP Defendants next argue that the Kitchins' common law tort claims in Count Six, for intentional infliction of emotional distress, and Count Seven, for "Survivor Claims," are governed by Maine's Wrongful Death Act, 18-A M.R.S.A. § 2-804 (Westlaw through Ch. 112, and 114 to 169 of 2019 1st Reg. Sess. of 129th Leg.), and are, therefore, subject to its two-year statute of limitations. The Kitchins respond that Counts Six and Seven are properly considered survival claims under Maine's survival statute, 18-A M.R.S.A. § 3-817, and that the claims are distinct from wrongful death claims. Count Six alleges that the defendants' failure to provide Kitchin with medical care caused Kitchin to experience "emotional distress prior to his death." ECF No. 4 ¶ 145. Count Seven alleges that the defendants' actions

9

"caused [Kitchin] pre-death suffering, injuries, mental and physical anguish and emotional distress[.]" *Id.* ¶ 150.

The Wrongful Death Act applies where a person's death was "caused by a wrongful act, neglect or default," which would have entitled that person to bring an action for damages absent his or her death. 18-A M.R.S.A. § 2-804(a). An action under the Act must be brought "by and in the name of the personal representative of the deceased person[,]" and any amount recovered "is for the exclusive benefit" of the decedent's surviving spouse, minor children, or other heirs. § 2-804(b). When the decedent's death "follow[ed] a period of conscious suffering," the statute provides that:

> the person who caused the personal injuries resulting in such conscious suffering and death shall, in addition to the action at common law and damages recoverable therein, be liable in damages in a separate count in the same action for such death, brought, commenced and determined and subject to the same limitation as to the amount recoverable for such death and exclusively for the beneficiaries in the manner set forth in subsection (b), separately found, but in such cases there shall be only one recovery for the same injury.

§ 2-804(c). The survival statute, in contrast, simply provides that "[n]o personal action or cause of action is lost by the death of either party, but the same survives for and against the personal representative of the deceased[.]" 18-A M.R.S.A. § 3-817(a).

The Maine Law Court discussed the interplay between Maine's survival and wrongful death statutes in *Bolton v. Caine*, 584 A.2d 615 (Me. 1990). In *Bolton*, the personal representative of the estate of a woman who had died of lung cancer brought a wrongful death suit against two Maine doctors for failing to diagnose her cancer when they took x-rays of her chest. *Id.* at 616. Those x-rays were taken nine months before she was diagnosed with cancer by another doctor. *Id.* The personal

representative initially believed that the Maine doctors' negligence had caused the decedent's death by preventing her from seeking earlier treatment, but an autopsy later revealed that the lung cancer was already too advanced to cure when the initial x-rays were taken and, therefore, the decedent's death was not caused by the doctors' inaction. *Id.*

The Law Court affirmed the trial court's grant of summary judgment to the doctors "on the counts in [the] plaintiff's complaint that rel[ied] on the wrongful death statute" because "the wrongful death statute only applies when a person's death is 'caused by a wrongful act, neglect or default' of another person[.]" *Id.* at 616-17 (quoting 18-A M.R.S.A. § 2-804(a)). But the Law Court also reversed the grant of summary judgment on two other counts in the plaintiff's complaint for negligent infliction of emotional distress, which sought "damages recoverable at common law for [the decedent's] conscious suffering." *Id.* at 616. The Law Court held that the trial court had "erred in ruling that the wrongful death statute [wa]s [the] plaintiff's exclusive remedy for her claim[,]" concluding that the decedent's negligent infliction of emotional distress claim against the doctors survived her death under Maine's survival statute. *Id.* at 617 & n.2. The words "conscious suffering," the court explained, do not equate to a wrongful death claim. *Id.* at 617.

The facts here are distinguishable from those in *Bolton* because the First Amended Complaint alleges that the defendants' omissions caused Kitchin's death and, therefore, the wrongful death statute is applicable in this context. But, as the Law Court recognized in *Bolton*, the wrongful death statute does not provide the exclusive remedy for a decedent's emotional distress claim. Indeed, the wrongful

11

death statute and the survival statute serve different purposes—"[t]he wrongful death statute provides for the recovery of damages for the emotional distress of [a] surviving spouse and minor children, but not of the decedent [him]self." *Bolton*, 584 A.2d at 617 n.2. Maine's survival statute, on the other hand, provides that a common law claim to recover for the emotional distress of the decedent himself survives his death. *Id*. Therefore, a spouse acting as a personal representative could hypothetically bring separate claims under each statute to recover for both his or her own emotional distress and that of the decedent. *Cf. Oliver v. E. Me. Med. Ctr.*, 193 A.3d 157, 161 n.2 (Me. 2018) (listing claims brought under both the wrongful death and survival statutes in a single suit).

For the reasons stated above, I construe Counts Six and Seven as emotional distress claims brought under Maine's survival statute, 18-A M.R.S.A. § 3-817, and conclude that those claims are not barred by the statute of limitations in Maine's Wrongful Death Act.

## C. The Americans with Disabilities Act

Next, the CHP Defendants argue that Counts Ten and Eleven, for violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. § 12131, *et seq.* (West 2019), must be dismissed because Correctional Health Partners is not a "public entity" and, therefore, is not subject to Title II. In response, the Kitchins contend that Correctional Health Partners is liable under Title II because the company falls within the definition of a "public entity" as an instrumentality of the state. *See* 42 U.S.C.A. § 12131(1)(B). The First Amended Complaint alleges that Correctional

Health Partners is "a private independent contractor that provides healthcare services to inmates at KCCF." ECF No. 4 ¶ 30.

Title II of the ADA requires that "no qualified individual with a disability . . . be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such an entity" by reason of his or her disability. 42 U.S.C.A. § 12132. As relevant here, a "public entity" is defined as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]" 42 U.S.C.A. § 12131(1)(A)-(B). "State prisons fall squarely within the statutory definition of 'public entity,'" and "prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). The question here is whether a private company that contracts with a county correctional facility, which is a "public entity," to provide medical services within the facility can be held liable as an "instrumentality of a State" for alleged violations of Title II in the provision of those "services."

Every Federal Court of Appeals that has considered whether a private company that has contracted with a state to provide services on its behalf is a "public entity" under Title II has answered the question in the negative. *See Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163, 169-70 (3d Cir. 2015); *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010); *Green v. City of New York*, 465 F.3d 65, 79 (2d Cir. 2006). The Second Circuit was the first to decide the issue in *Green v. City of New York,*

13

where the court applied the canon of *noscitur a sociis*—that the meaning of a word may be determined by the words that accompany it—to resolve the ambiguous meaning of "instrumentality of a state." 465 F.3d at 79. The Second Circuit concluded that "instrumentality" is "best read as referring to a creature of a state," i.e., an entity that was created by the government, because each of the other entities listed in the statute is "a creature of the municipality or state whose ends it serves." *Id.* Because a private company that contracts with a state is not created by a governmental entity, it is not a "public entity" under Title II of the ADA but is instead "a parallel private entity." *Id.* at 79; *see also Turner v. Mull*, 997 F. Supp. 2d 985, 997 (E.D. Mo. 2014), *aff'd*, 784 F.3d 485 (8th Cir. 2015) ("A private contractor does not become a 'public entity' under Title II merely by contracting with a governmental entity to provide governmental services."); 1 *Ams. with Disab.: Pract. & Compliance Manual* § 2:33 (2019) (same).

The Kitchins point to one District of Maine decision that reached the opposite conclusion. In *McNally v. Prison Health Services*, 46 F. Supp. 2d 49 (D. Me. 1999), a Cumberland County Jail detainee alleged that he had been denied medication because of his HIV status. *Id.* at 57. The court denied a summary judgment motion filed by the defendant, a private company that provided medical services at the jail, but did not analyze whether the company was a public entity under the ADA. *Id.* at 59. The court simply concluded that "prisons and jails are 'public entities' covered by Title II of the ADA[,]" the "provision of services" is a benefit to which qualified individuals are entitled under the ADA, and the company's "prescription service and the disposition of HIV-positive prisoners' requests for their medication is a program

14

or service of Cumberland County Jail." *Id.* at 57-58. The court's explanation in *McNally* aligns closely with the Supreme Court's statement in *Yeskey* that "[s]tate prisons fall squarely within the statutory definition of 'public entity,'" and that they provide "services," including medical care, from which qualified persons with disabilities must not be excluded under Title II. *Compare McNally*, 46 F. Supp. 2d at 57-58, *with Yeskey*, 524 U.S. at 210. But this begs the question of whether a private company with whom the state contracts to administer those services may be held liable as a "public entity."

In the absence of First Circuit authority on the issue, I defer to "the currently prevailing view in the circuit courts that government contractors are not liable under Title II." *Wilkins-Jones v. Cty. of Alameda*, 859 F. Supp. 2d 1039, 1047 (N.D. Cal. 2012). The Second Circuit's reasoning in *Green*, that a private company that contracts with a state is not a "public entity" because it is not created by a governmental entity, is persuasive. I therefore conclude that a private company that contracts with the state to provide medical services in a county correctional facility is not a "public entity" under Title II of the ADA. *See Green*, 465 F.3d at 79; *see also Lee v. Corr. Corp. of Am./Corr. Treatment Facility*, 61 F. Supp. 3d 139, 143 (D.D.C. 2014) (holding that company operating private prison is not a public entity under Title II). It bears explanation that this conclusion does not mean that a plaintiff claiming a violation of the ADA arising from that company's actions is left without recourse. The public entities with whom private companies contract to provide services within public prisons remain liable for violations of the ADA that occur within a prison's walls. *Lee,* 61 F. Supp. 3d at 143 n.2. Here, however, Correctional Health Partners

is not a "public entity" and, for that reason, I grant the CHP Defendants' motion to dismiss Counts Ten and Eleven of the First Amended Complaint against Correctional Health Partners and Mix.

## III.  CONCLUSION

For the reasons stated above, it is **ORDERED** that Defendants Correctional Health Partners, LLC and Jennifer Mix's Motion to Dismiss (ECF No. 24) is **GRANTED IN PART** with respect to Counts Nine, Ten, Eleven, and Twelve, and **DENIED IN PART** with respect to Counts Five, Six, Seven, and Eight.

**SO ORDERED.**

**Dated this 19th day of June, 2019.**

　　　　　　　　　　　　　　　　　　　　　　　**/s/ JON D. LEVY**
　　　　　　　　　　　　　　　　　　　**CHIEF U.S. DISTRICT JUDGE**