## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| DANIELLE KITCHIN and DANA B. KITCHIN, Co-Personal Representatives and heirs of the ESTATE OF DANA A. KITCHIN,<br><br>Plaintiffs,<br><br>v.<br><br>RANDALL LIBERTY, in his individual and official capacity as Sheriff of Kennebec County,<br>KEN MASON, in his official capacity as Sheriff of Kennebec County,<br>KENNEBEC COUNTY,<br>KENNEBEC COUNTY SHERIFF'S OFFICE,<br>KENNEBEC COUNTY CORRECTIONS DIVISION,<br>KENNEBEC COUNTY CORRECTIONAL FACILITY,<br>KENNEBEC COUNTY COMMISSIONERS being PATSY G. CROCKETT, Kennebec County Commissioner, District 1 in her individual and official capacity; NANCY G. RINES, District 2 in her individual and official capacity; and GEORGE M. JABAR, II, District 3 in his individual and official capacity,<br>CORRECTIONAL HEALTH PARTNERS, LLC,<br>JENNIFER MIX, D.O., in her individual and official capacity,<br>STEPHEN RICHARD KREBS, MD., in his individual and official capacity<br>BRANDON GARDNER, in his individual and official capacity,<br>NATHAN LETOURNEAU, in his individual and official capacity,<br>BRYAN ROBBINS, in his individual and official capacity,<br>AMANDA L. PAINE (f/k/a AMANDA CARLOW), in her individual and official capacity,<br>MYRA GAGNON, in her individual and official capacity<br>AARON BEALE, in his individual and official capacity,<br>NICHOLAS ROUTHIER, in his individual and official capacity,<br>ALEX MORIN, in his individual and official capacity,<br>DARRELL BRYANT, in his individual and official capacity,<br>KEITH LACHANCE, in his individual and official capacity, | **Docket No.**<br>**1:18-cv-00356-JDL**<br><br><br><br>**SECOND AMENDED COMPLAINT AND JURY TRIAL DEMAND** |

| ANN-MARIE ULRICH, in her individual and official capacity,<br>CARMEN MULHOLLAND, in her individual and official capacity,<br>MARSHA ALEXANDER,  in her individual and official capacity,<br>and<br>JOHN AND JANE DOES 1 THROUGH 100, all whose true names are unknown,<br>Defendants. | |

The Estate of Dana Kitchin through its attorneys, Timothy E. Zerillo, Esq., Zerillo Law Firm, LLC and John M. Burke, Esq., Caseiro Burke LLC, brings this action under the United States Constitution, 42 U.S.C. §1983, Americans With Disabilities Act and various common law claims of the State of Maine.

### I. INTRODUCTION AND OVERVIEW

1.    This is a wrongful death and survival action for compensatory, statutory, and punitive damages against Defendants who, by virtue of their grossly negligent and wanton acts and omissions, directly and proximately caused the death of Dana A. Kitchin during his confinement in the Kennebec County Correctional Facility (*hereinafter,* the "KCCF").

2.    Plaintiffs Danielle Kitchin and Dana B. Kitchin, the Daughter, Son and Co-Personal Representatives of the Estate of Dana A. Kitchin (*hereinafter,* "the Estate"), bring the following claims on behalf of the Estate.  As alleged herein, Plaintiffs' claims arise under the statutory and common law of the State of Maine, the Maine and United States Constitutions and 42 U.S.C. §1983.  Corrections officers and medical staff at the KCCF were inadequately trained as to how and when to provide appropriate medical care.

3.    Despite his awareness that KCCF medical staff and corrections officers needed additional

training to competently perform their jobs, Liberty and/or Mason and the other supervisors for the KCCF ignored the clear warning signs that a detainee soon would be severely injured, or in the case of Dana A. Kitchin, killed.

4.     The Defendants' acts alleged herein violated Dana A. Kitchin's constitutional rights to be free from excessive force and cruel and unusual punishment. Those acts, which also violated Maine common law, statutory law, and federal law, combined with the Defendants' failure to train, hire and supervise KCCF corrections officers and medical staff, were the proximate cause of the death of Dana A. Kitchin.

5.     At all times complained of herein, Dana A. Kitchin suffered from a serious medical need.

6.     This serious medical need was so obvious that even a layperson would recognize the need for medical attention.

7.     The Defendants had a purposeful intent and/or deliberate indifference to Dana A. Kitchin's serious medical need.

8.     The Defendants had wanton disregard for Dana A. Kitchin's serious medical need.

9.     Alternatively, Defendants ignored Dana A. Kitchin's serious medical need to punish him.

## II.     JURISDICTION AND VENUE

10.     This Action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution, 42 U.S.C. §1983 and Article 1, Section 6-A of the Maine Constitution. The jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§1331.

11.     Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because any state action stems from the same common nucleus of operative facts as the federal civil rights claim.

12.     This Honorable Court wields jurisdiction over each of the Defendants named herein in that each Defendant is domiciled in the State of Maine, works in the State of Maine or has worked for KCCF.

13.     Venue is properly laid before this Honorable Court pursuant to 28 U.S.C. § 1391 and Rule 9(a) of the rules of the United States District Court for the District of Maine in that all of the acts complained of occurred in Augusta, Maine.

### III.    THE PARTIES

14.     Plaintiff Danielle Kitchin is a citizen and resident of Somerset County, Maine.  Ms. Kitchin was qualified as a Co-Personal Representative of the Estate of Dana A. Kitchin on December 5, 2016. Ms. Kitchin brings this action as Co-Personal Representative of the Estate of Dana A. Kitchin.  Ms. Kitchin is the Daughter of Dana A. Kitchin.

15.     Plaintiff Dana B. Kitchin is a citizen and resident of Kennebec County, Maine.  Mr. Kitchin was qualified as a Co-Personal Representative of the Estate of Dana A. Kitchin on December 5, 2016. Mr. Kitchin brings this action as Co-Personal Representative of the Estate of Dana A. Kitchin.  Mr. Kitchin is the Son of the Dana A. Kitchin.

16.     Dana A. Kitchin (*also* "Decedent"), was a citizen of Maine and a resident of Kennebec County until his death on December 12, 2014.

17.     Defendant Sheriff Randall Liberty (*hereinafter,* "Liberty") is a citizen and resident of Kennebec County. At all times relevant to this action, he was the Sheriff of Kennebec County. Liberty was responsible for the care and custody of inmates of the KCCF located in Kennebec County at the time the cause of action herein arose.

18.     Defendant Sheriff Ken Mason (*hereinafter,* "Mason") is a citizen and resident of

Kennebec County. He is currently the Sheriff of Kennebec County.  Mason is responsible for the care and custody of inmates of the KCCF located in Kennebec County.

19.     Liberty and/or Mason were charged by law and responsible for the administration of the KCCF, and for the training, supervision and hiring of persons, agents and employees working within the KCCF, including custody officers, supervisors and deputies, nurses, doctors, emergency medical personnel, physician assistants, medical staff, mental health staff, including corrections officers and Defendant Does (*defined herein*).

20.     Liberty was responsible for the customs, policies and practices of the KCCF at the time of Mr. Kitchin's death, and Mason continues to be responsible for the KCCF, its customs, policies and practices.  The unconstitutional policies and practices of the KCCF, along with the failure to train, hire and supervise KCCF staff, were the moving force behind the deprivation of Mr. Kitchin's rights, and directly lead to his untimely death.  Liberty and/or Mason were responsible for ensuring appropriate staffing levels for qualified custodial staff at the KCCF, as well as for all shifts to be properly supervised, trained and disciplined.

21.     Plaintiffs sue Liberty in his individual and official capacities.  At all times alleged herein, Liberty was acting within the scope of his employment and under color of law.

22.     Plaintiffs sue Mason in his official capacity as Sheriff of Kennebec County.

23.     Defendant Kennebec County, Maine (*hereinafter,* the "County"), is an incorporated regional government body responsible for supervising and operating the Kennebec County Sheriff's Office and KCCF.

24.     The County was responsible for the supervision of Liberty, Mason and the KCCF.  The County is a county organized in the State of Maine as of 1799, whose principal place of business

is 125 State Street, 2nd Floor, Town of Augusta, County of Kennebec, State of Maine 04330 and is a duly organized entity of local government under Maine law. The County transacts its affairs in the County of Kennebec.

25.     Defendant Kennebec County Sheriff's Office (*hereinafter* "KCSO") is a department within the County of Kennebec which operates the KCCF and has a principal office located at 125 State Street, Town of Augusta, County of Kennebec, State of Maine 04330.  The KCSO is a duly organized entity of local government under Maine law and County code or ordinance. The KCSO transacts its affairs in the County.

26.     Defendant Kennebec County Corrections Division (*hereinafter* "KCCD") is a division of the KCSO and is part of the County local government which is operated by the KCSO. It has a principal location of 115 State Street, Town of Augusta, County of Kennebec, State of Maine 04330. KCSO is a duly organized entity of local government under Maine law and County code or ordinance. The KCCD transacts its affairs in the County.

27.     Defendant KCCF is part of the KCCD of the County which is operated by the KCSO and has a principal location of 115 State Street, Town of Augusta, County of Kennebec, State of Maine 04330. KCCF is a duly organized entity of local government under Maine law and County code or ordinance. The KCCF transacts its affairs in the County.

28.     Defendant Kennebec County Commissioners (*hereinafter* "Commissioners") are the County Commissioners. The Commissioners have a principal location of 125 State Street, 2nd Floor, Augusta, Maine 04330. Each Commissioner, Patsy G. Crockett, Nancy G. Rines and George Jabar, II is sued in their individual and official capacities. Pursuant to 30-A M.R.S.A. §61(1), each Commissioner is required to reside in the district which they represent. Each

Commissioner is therefore required to reside in the County. At all times pertinent to this action, the Commissioners acted under color of state law. Each of the County Commissioners resides, is found in, has an agent, or transacts his or her affairs in the County.

29.     Defendant Correctional Health Partners (*hereinafter* "CHP") is a for-profit company organized under the laws of the State of Colorado and has a principal place of business located at 1125 17th, Street Suite 1000, City of Denver, State of Colorado 80202. CHP provides medical services to the KCCF.

30.     CHP is a private independent contractor that provides healthcare services to inmates at KCCF.

31.     CHP acts as utilization management for KCCF, and makes medical decisions for inmates there. CHP is a proper entity to be sued under 42 U.S.C. § 1983 for its own deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff with respect to the gatekeeping function of allowing medical care and treatment for inmates with chronic and acute care needs.

32.     On information and belief, CHP provides services to KCCF pursuant to a contract or agreement.  CHP is paid a fee for its services.

33.     On information and belief, CHP is responsible for healthcare at KCCF, and to that end developed a set of governing policies and procedures related to the healthcare of inmates and detainees.

34.     On information and belief, CHP is required to regularly confer with Liberty, Mason, KCSO, KCCD and KCCF concerning both existing healthcare procedures and any changes to those procedures at the KCCF.

35.     Stephen Richard Krebs, MD (*hereinafter* "Krebs") was, on information and belief, the Chief Medical Officer of CHP at the time of the Decedent's death.  Krebs is a citizen of the United States. On information and belief, Krebs is a resident of Kansas. At all times relevant to the subject matter of this litigation, Krebs was acting under color of state law in his capacity as a Supervising Physician at the KCCF and CHP Chief Medical Officer.  Krebs ignored risks to Decedent's health, and/or or was deliberately indifferent with respect to the serious medical needs of the Decedent, and/or the provision of inmate medical and mental health care at KCCF.

36.     Jennifer Mix, D.O. (*hereinafter* "Mix") is currently the Chief Medical Officer of CHP.  At the time of Decedent's death, Mix was the Senior Medical Director of CHP. Mix is a citizen of the United States and a resident of Colorado.  At all times relevant to the subject matter of this litigation, Mix was acting under color of state law in her capacity as a Senior Medical Director of CHP.  Mix ignored risks to Decedent's health, and/or or was deliberately indifferent with respect to the serious medical needs of the Decedent, and/or the provision of inmate medical and mental health care at KCCF.

37.     According to the CHP website[1], "Dr. Jennifer Mix leads CHP's team of correctional Medical Directors, nurses and physicians. Dr. Mix has worked for Correctional Health Partners for over 10 years to oversee the clinical delivery and management systems for our clients. Dr. Mix actively develops physician and specialist relationships through education on care management initiatives and reviews client utilization and our performance data. She has overall responsibility for CHP's clinical programs. Her primary and correctional care expertise ensures the optimization of onsite medical services to maintain program efficiency and ensure best

---

[1] https://www.chpdelivers.com/about-us/

practices in care and appropriate offsite referrals."

38.     Corporal Brandon Gardner is a corrections officer employed by the KCCF, KCSO and KCCD.  He resides in Maine, town unknown to the Plaintiff at this time.  It is Plaintiffs' belief that he resides in Kennebec County.   He is being sued in both his individual and official capacities.   At all times pertinent to this action, he acted under color of State law.  He was working at the KCCF on or about December 12, 2014.  He was responsible to ensure the medical safety of inmates and detainees at KCCF.   He ignored an obvious and urgent medical need relative to Dana A. Kitchin, and Mr. Kitchin suffered and later died as a result.  Gardner also supervised other corrections officers at KCCF.

39.     Corrections Officer Nathan Letourneau is a corrections officer employed by the KCCF, KCSO and KCCD.  He resides in Maine, town unknown to the Plaintiff at this time.   It is Plaintiffs' belief that he resides in Kennebec County.  He is being sued in both his individual and official capacities.  At all times pertinent to this action, he acted under color of State law.  He was working at the KCCF on or about December 12, 2014.  He was responsible to ensure the medical safety of inmates and detainees at KCCF.   He ignored an obvious and urgent medical need relative to Dana A. Kitchin, and Mr. Kitchin suffered and later died as a result.

40.     Corrections Officer Bryan Robbins is a corrections officer employed by the KCCF, KCSO and KCCD.  He resides in Maine, town unknown to the Plaintiff at this time.  It is Plaintiffs' belief that he resides in Kennebec County.  He is being sued in both his individual and official capacities.  At all times pertinent to this action, he acted under color of State law.  He was working at the KCCF on or about December 12, 2014.  He was responsible to ensure the medical safety of inmates and detainees at KCCF.   He ignored an obvious and urgent medical need

relative to Dana A. Kitchin, and Mr. Kitchin suffered and later died as a result.

41.     Amanda L. Paine, formerly known as Amanda Carlow, is a former corrections officer who was employed by the KCCF, KCSO and KCCD.  She resides in Oakland, Maine, although she may be on a military deployment at this time.  She is being sued in both her individual and official capacities.  At all times pertinent to this action, she acted under color of State law.  She worked at the KCCF on or about December 12, 2014.  She was responsible to ensure the medical safety of inmates and detainees at KCCF.  She ignored an obvious and urgent medical need relative to Dana A. Kitchin, and Mr. Kitchin suffered and later died as a result.

42.     Corrections Officer Myra Gagnon is a corrections officer employed by the KCCF, KCSO and KCCD.  She resides in Maine, town unknown to the Plaintiff at this time.  It is Plaintiffs' belief that she resides in Kennebec County.  She is being sued in both her individual and official capacities.  At all times pertinent to this action, she acted under color of State law.  She worked at the KCCF on or about December 12, 2014.  She was responsible to ensure the medical safety of inmates and detainees at KCCF.  She ignored an obvious and urgent medical need relative to Dana A. Kitchin, and Mr. Kitchin suffered and later died as a result.

43.     Corrections Officer Aaron Beale is a corrections officer employed by the KCCF, KCSO and KCCD.  He resides in Maine, town unknown to the Plaintiff at this time.  It is Plaintiffs' belief that he resides in Kennebec County.  He is being sued in both his individual and official capacities.  At all times pertinent to this action, he acted under color of State law.  He was working at the KCCF on or about December 12, 2014.  He was responsible to ensure the medical safety of inmates and detainees at KCCF.  He ignored an obvious and urgent medical need relative to Dana A. Kitchin, and Mr. Kitchin suffered and later died as a result.

44.     Corrections Officer Nicholas Routhier is a corrections officer employed by the KCCF, KCSO and KCCD.  He resides in Maine, town unknown to the Plaintiff at this time.  It is Plaintiffs' belief that he resides in Kennebec County.  He is being sued in both his individual and official capacities.  At all times pertinent to this action, he acted under color of State law.  He was working at the KCCF on or about December 12, 2014.  He was responsible to ensure the medical safety of inmates and detainees at KCCF.  He ignored an obvious and urgent medical need relative to Dana A. Kitchin, and Mr. Kitchin suffered and later died as a result.

45.     Corrections Officer Alex Morin is a corrections officer employed by the KCCF, KCSO and KCCD.  He resides in Maine, town unknown to the Plaintiff at this time.  It is Plaintiffs' belief that he resides in Kennebec County.  He is being sued in both his individual and official capacities.  At all times pertinent to this action, he acted under color of State law.  He was working at the KCCF on or about December 12, 2014.  He was responsible to ensure the medical safety of inmates and detainees at KCCF.  He ignored an obvious and urgent medical need relative to Dana A. Kitchin, and Mr. Kitchin suffered and later died as a result.

46.     Corrections Officer Darrell Bryant is a corrections officer employed by the KCCF, KCSO and KCCD.  He resides in Maine, town unknown to the Plaintiff at this time.  It is Plaintiffs' belief that he resides in Kennebec County.  He is being sued in both his individual and official capacities.  At all times pertinent to this action, he acted under color of State law.  He was working at the KCCF on or about December 12, 2014.  He was responsible to ensure the medical safety of inmates and detainees at KCCF.  He ignored an obvious and urgent medical need relative to Dana A. Kitchin, and Mr. Kitchin suffered and later died as a result.

47.     Sergeant Keith LaChance is a corrections officer employed by the KCCF, KCSO and

KCCD.  He resides in Maine, town unknown to the Plaintiff at this time.  It is Plaintiffs' belief that he resides in Kennebec County.  He is being sued in both his individual and official capacities.  At all times pertinent to this action, he acted under color of State law.  He was working at the KCCF on or about December 12, 2014.  He was responsible to ensure the medical safety of inmates and detainees at KCCF.  He ignored an obvious and urgent medical need relative to Dana A. Kitchin, and Mr. Kitchin suffered and later died as a result.

48.    Carmen Mulholland was a registered nurse in the State of Maine who, at all times relevant to this Complaint, was employed by CHP. Defendant Mulholland's nursing license expired April 9, 2018. At the time of the Decedent's death, Defendant Mulholland was a resident of Maine. On information and belief, her current address is 1283 Jonah Drive, North Port, FL 34289-9497. At all times relevant to this Complaint, Defendant Mulholland provided health services as a registered nurse to the County, the KCSO and KCCD  and/or KCCF.

49.    Ann-Marie Ulrich is a registered nurse in the State of Maine who, at all times relevant to this Complaint, was employed by CHP. She resides in Maine. On information and belief, she resides at 26 Legion Park Road, Windsor, ME 04363-3025.   At all times relevant to this Complaint, Defendant Ulrich provided health services as a registered nurse to the County, the KCSO and its KCCD and/or KCCF.

50.    Captain Marsha J. Alexander was the Corrections Administrator for KCSO and is a resident of Oakland, Maine, County of Kennebec. At all times pertinent to this action, she was a supervisor and/or high-ranking official at KCSO with management authority over the KCCF staff and inmates at the KCCF. She is being sued in both her official and individual capacities. At all times pertinent to this action, Defendant Alexander acted under the color of state law.

51.     Defendants John and Jane Does 1 through 100 (*hereinafter*, "Defendant Does") are individuals whose names and addresses of residence are unknown. However, they include at all relevant times alleged herein, the KCCF, KCSO, KCCD, CHP, Corrections Officers, Supervisory Staff, Chief Deputies, and/or Captains in charge of assisting administration of the KCCF; making policies and/or ensuring constitutionally adequate policies were implemented and followed; commanding relevant watches; and supervising, training, and disciplining staff members.

52.     Defendant Does include at all relevant times alleged herein, the staff of the KCCF Medical Department, along with their successors.

53.     Plaintiffs allege on information and belief that each of the Defendant Does were employed by the KCCF, the KCSO, KCCD, CHP and/or the County at the time of the conduct alleged herein.  Plaintiffs allege that each of the Defendant Does were responsible for the training, supervision and/or conduct of KCCF employees and/or agents involved in the conduct alleged herein.

54.     Plaintiffs allege that the Defendant Does were responsible for and caused the acts and injuries alleged herein.  Plaintiffs believe and allege that each of the Defendant Does is legally responsible and liable for the incident, injuries and damages hereinafter set forth.  Each Defendant Doe in this matter caused injuries and damages because of their negligence, breach of duty, negligent supervision, management or control, and violation of public policy.

55.     Each Defendant Doe is liable for his or her personal conduct, vicarious or imputed negligence, fault or breach of duty, whether severally or jointly, or whether based upon agency, employment, ownership, entrustment, custody, care, control, or upon any other act or omission.

56.     Plaintiffs will seek to amend this Complaint as soon as the true names and identities of Defendant Does have been ascertained.

## IV.    STATEMENT OF FACTS

57.     The Decedent was detained in the KCCF on misdemeanor charges from December 10, 2014, until his death, on or about December 12, 2014.

58.     The Decedent was a 64-year-old man at the time of his death on December 12, 2014.

59.     The Decedent was well-known to KCCF staff and CHP employees, as he been incarcerated at the KCCF on numerous occasions for minor violations.

60.     While incarcerated at the KCCF, the Decedent frequently complained about issues with the facility, including being placed in general population.

61.     As early as October 8, 2003, a correction officer wrote that he told Mr. Kitchin that he was "tired of the whining 17 hrs a day."

62.     The correction officers and staff at the KCCF considered the Decedent a nuisance.  He was called "loud and uncooperative" by corrections officers.  Correction Officer Bryan Robbins stated on the day the Decedent died, that the Decedent was "kicking and banging...like he usually does."  Other corrections officers noted that Decedent was not cooperative.

63.     At the time an inmate is processed for admission, the KCCF completes an admission for medical screening form, in addition to forwarding medical forms to health clinic employees, including CHP employees.

64.     The Decedent previously mentioned to the KCCF that he was diagnosed with "bi-polar." In addition, the Decedent had been diagnosed with posttraumatic stress disorder, alcohol abuse/dependence, arthritis, chronic cervical pain, peripheral vascular disease, degenerative

14

cervical disc disease and deep vein thrombosis (*hereinafter*, "DVT").

65.     On information and belief, KCCF and CHP were aware of these diagnoses.

66.     KCCF was aware of the medications the Decedent had been taken prior to his December 10, 2014 incarceration. Three medications were previously verified as medication prescribed to the Decedent: Tramadol, Warfarin and Enoxaparin.

67.     On information and belief, Tramadol was prescribed to manage the Decedent's pain. Warfarin and Enoxaparin are blood thinners prescribed to manage the Decedent's DVT.

68.     Prior to the Decedent's incarceration on December 10, 2014, the KCCF and CHP only approved the Warfarin, despite the other medications prescribed to the Decedent.

69.     On information and belief, CHP medical staff at the KCCF never discussed with the Decedent his medications nor ordered his medications.

70.     On information and belief, no medications were provided to the Decedent from December 10, 2014 to December 12, 2014. Only a trace amount of Warfarin was found in the Decedent's blood during his autopsy. A comprehensive postmortem toxicology was otherwise negative.

71.     Senior Officer in Charge (*hereinafter*, "SOIC") Darrell Bryant noted to investigators that the Decedent's health seemed to be failing the last couple of times he had been incarcerated.

72.     The KCCF and CHP were aware of the medications the Decedent was prescribed prior to his incarceration of December 10, 2014.

73.     After booking, the Decedent was held in a cell that was located in the intake area, also known as the "observation cells" of the KCCF.

74.     The Decedent's cell was near the control center of the intake area, commonly known as

the "bubble" by inmates.

75.     Inmates held in the observation cells are subject to constant supervision, including checks every 15 minutes.

76.     On December 11, 2014, the Decedent began calling out for help from KCCF corrections and medical staff.   He repeatedly banged on his cell door and cried for help. As the day progressed, the Decedent began requesting that he go to the hospital.

77.     On said date, Decedent began smearing food and feces throughout his cell, while continuously demanding help.

78.     On December 11, 2014, Sergeant Daniel Cyr (*hereinafter*, "Sgt. Cyr") was working at the KCCF as the shift supervisor.

79.     Sgt. Cyr brought the Decedent to the search and shower room after the Decedent requested to use the bathroom to "take a shit." The Decedent was then returned to a different cell while maintenance fixed a window bracket in the Decedent's cell.

80.     Later that day, Sgt. Cyr returned to the Decedent's cell after he requested water.

81.     Sgt. Cyr opened the Decedent's cell door and observed "feces on the floor next to the grate."

82.     Sgt. Cyr was informed by Correction Officer Ivano Stefanizzi that the Decedent was complaining of stomach pains.

83.     Based on the smell of the Decedent's feces and complaints of stomach pain, Sgt. Cyr went to the medical department and informed Nurse Carmen Mulholland (*hereinafter*, "Nurse Mulholland).

84.     On information and belief, Nurse Mulholland was the nursing director at the KCCF.

85.     On information and belief, Nurse Mulholland told Sgt. Cyr that the Decedent was a sick man, and that's why he was having stomach pains.

86.     Under KCCF's Medical Services policy, an administration official, shift supervisor or, in this case, a CHP employee can request medical or mental health evaluations. This is in addition to routine evaluations, including the evaluations that are supposed to occur at the time an inmate is booked at KCCF.   If an evaluation is requested, it will be performed as soon as arrangements can be made. Evaluations typically occur the day they are requested.

87.      On December 11, 2014, Nurse Mulholland instructed Nurse Ann-Marie Ulrich (*hereinafter*, "Nurse Ulrich") to check on the Decedent.

88.     Nurse Ulrich never visited the Decedent on December 11, 2014.

89.     Nurse Mulholland never checked with Nurse Ulrich about the Decedent's medical status or whether she examined him as instructed. Nurse Mulholland admitted that it was obvious the Decedent was sick.

90.     On or about December 11, 2014, Michael Nickerson (*hereinafter,* "Nickerson") was held in the intake area of the KCCF.

91.     On information and belief, Nickerson was placed in a cell located in the intake area where the Decedent was being held. Nickerson's cell was two cells away from the Decedent's cell.

92.     Nickerson could see Decedent's arms and side profile from his cell.

93.     While in his cell, Nickerson witnessed and heard the Decedent kicking, hitting and banging on his cell door while loudly crying out for medical attention.

94.     Nickerson heard the Decedent shouting that his chest hurt as he continued to scream for

medical attention.

95.    Nickerson signed a statement indicating that "For around 7-8 hrs. while waiting to be processed I heard Dana Kitchin banging and knocking on his cell door for the whole time I was in intake asking to be seen by a nurse and that he needed to be brought to the hospital.  He was ignored the whole time and the CO's said that he always acts like this and that's why they ignore him."

96.    KCCF prohibits on-duty correction officers from gossiping about inmates.

97.    At the time Nickerson left the KCCF intake area for his cell block, the Decedent was still loudly calling out for medical attention.  The Decedent's cries were easily heard by anyone in the intake area and throughout the KCCF.  The Decedent's calls for medical attention continued to be ignored by KCCF staff at the time Nickerson left the intake area.

98.    Nickerson never observed KCCF Correction Officers or staff performing the mandatory 15-minute checks on the Decedent.

99.    On December 12, 2014, the Decedent continued his cries for help and medical attention.

100.    On information and belief, the Decedent was in a great deal of pain, emotional distress and was conscious during the period that he cried out for help.

101.    The Decedent continued to make numerous requests to go to the hospital. None of which were acted upon.

102.    Following the Decedent's death, three inmates were interviewed. One of the inmates interviewed was asked about how the day started on December 12, 2014, the inmate replied "it started with him [the Decedent] banging and saying the he needed help. The inmate stated said there were requests for medical and go to the hospital. It turned to a weak and raspy voice as the

day progressed."

103.    Another inmate indicated that the Decedent was complaining about his stomach before he passed away.

104.    On December 12, 2014, Sgt. Keith LaChance was the SOIC on the 12:00 am- 8:00 am shift.

105.    As the SOIC, Sgt. LaChance was responsible for the operation of the KCCF, the safety and security of the facility, including the inmates and the corrections officers he supervises.

106.    On December 12, 2014, Sgt. LaChance and Correction Officer Carlow spoke with the Decedent. The Decedent informed him that he needed to go to the hospital and that his stomach hurt. In addition, the Decedent's cell was covered in feces and blood.

107.    Sgt. LaChance entered the Decedent's cell and examined the Decedent's hand, which was bleeding.

108.    Sgt. LaChance exited the Decedent's cell and told Officer Carlow that the Decedent appeared to be okay.

109.    Sgt. LaChance never notified  medical of the Decedent's request.

110.    In addition, Sgt. LaChance left  the Decedent in a cell that was covered in feces and blood. Instead of moving the Decedent to another cell or secured area at the KCCF, Sgt. LaChance allowed the Decedent to sit in his feces.

111.    Feces and/or blood was smeared on the Decedent's cell and cell window for a period of approximately 14 hours, which covered three overlapping shifts. Despite this, no one at the KCCF assisted the Decedent to ensure his cell was clean and sanitary, nor ensured that the Decedent was well and not suffering from a medical condition.

112.     On December 12, 2014, Correction Officer Nathan Letourneau spoke with the Decedent on at least two occasions. On both occasions, the Decedent asked for help.

113.     On one occasion, the Decedent told Officer Letourneau that he was having a heart attack. Officer Letourneau never entered the cell nor contacted medical.

114.     On December 12, 2014, there was a corrections officer doing at least a 5-minute cell check on the inmate or detainee in the cell next to Kitchin's cell.

115.     Kevin Swift (*hereinafter*, "Swift") was held in the intake area of the KCCF on or about December 12, 2014, after being arrested for a probation violation.

116.     Swift heard the Decedent loudly banging on his cell door and screaming for help.

117.     Swift observed a nurse come to the Decedent's cell while Swift was in the intake area. Swift heard the Decedent beg the nurse for medical attention and to be taken to the hospital.  The nurse never entered the Decedent's cell and the Decedent was not taken to the hospital.

118.     Swift believes that the banging and yelling by the Decedent was so loud that it could be heard on the second floor of the KCCF.

119.     Eventually, Swift noticed that all went quiet in the direction of the Decedent's cell and Swift went to sleep. The Decedent was so loud in his cries for help before that time that Swift was unable to sleep.

120.     On December 12, 2014, the Decedent was found dead in his cell.

121.     Upon entering the cell, forcibly because the Decedent was laying in front of the cell door, Cpl. Jillian St. Pierre observed the Decedent's eyes and mouth were both open and his skin was a yellowed color.

122.     Swift saw KCCF staff bring the Decedent's body out of his cell on a stretcher in a body

bag.

123.   On December 12, 2014, Paramedic Jason McKinnon was dispatched to the KCCF. He was told that the Decedent requested help prior to his death.

124.   On December 14, 2014, an autopsy of the Decedent's remains was performed by Dr. Kristen G. Sweeny of the Office of Chief Medical Examiner.

125.   Dr. Sweeny found that the Decedent suffered from a "Massive hemoperitoneum due to ruptured spleen."

126.   Had the Decedent been given emergency medical treatment promptly, his life would have been saved.

127.   Correction Officer Brian Robbins gave a written statement concerning the subjects giving rise to the Complaint in which he indicated the following: Robbins claims that he and Officer Letourneau checked on Dana A. Kitchin and he said, "help me."    Robbins indicates that throughout the day of Dana A. Kitchin's death that the Decedent kept saying "help me" and "help me I can't move."  Defendant Robbins indicated that Officer Brian Gardner ordered Dana A. Kitchin to move from away from the cell door, and Dana A. Kitchin said "push me out of the way with the door I can't move." Gardner refused and Dana A. Kitchin stated "I need water." Moreover, Dana A. Kitchin "kept stating 'help me.'"  At approximately 1549 hours on December 12, 2014, Robbins started doing checks and found Dana A. Kitchin unresponsive. Kitchin was in front of his cell door.  He was "very pale, not breathing and unresponsive."

128.   Sheriff's Deputy Lauren Kief gave a written statement concerning the subjects giving rise to the Complaint in which she indicated the following: On December 12, 2014, she was doing video arraignments for inmates.  At 1540 hours, Deputy Kief noticed that Dana A. Kitchin was

propped up in the cell not moving.  At 1600 hours, Kief noticed that Kitchin was still not moving in his cell.

129.    Sheriff's Deputy Chelsea Merry gave a written statement concerning the subjects giving rise to the Complaint in which she indicated the following:  On December 12, 2014 at 1540 hours she was taking a female inmate to video arraignment.  She noticed that the back of Dana A. Kitchin's head was laying against the cell door.  He appeared to be asleep.  At 1555 hours, Merry escorted the female inmate back to her cell and Kitchin had not moved.

130.    Former Corrections Officer Amanda Carlow gave a written statement on December 17, 2014 concerning the subjects giving rise to the Complaint in which she indicated the following: she was an intake officer on December 12, 2014 working the 12 am to 8 am shift.  At her shift change, Corrections Officer Aaron Beale, told former Correction Officer Carlow and the other officers that the Decedent was banging all night on his cell and not being pleasant.  At 0050 hours, Officer Carlow switched from intake officer to floater.  She could hear the Decedent banging on his cell door and yelling at officers.  During one shift, the Decedent asked Officer Carlow to come to his cell door. Officer Carlow reports that "Inmate Kitchin stated that his stomach hurt and he needed to go to the hospital.  I asked what was wrong and he stated his stomach was bleeding...I didn't see any physical signs or reasons...to send him to the hospital." Carlow later observed Kitchin nearly pass out.  She saw him catch himself. Officer Carlow saw that Kitchin was breathing, and asked if he was okay.  Kitchin did not respond.  Officer Carlow did not call for medical assistance for the Decedent.

131.    No  KCCF Staff, correction officer or CHP employee administered CPR on the Decedent.

132.    Paramedics were called to the KCCF at 1613 hours on December 12, 2014.  Paramedics

arrived at KCCF at 1618. Dana A. Kitchin was pronounced dead at 1620 hours.

133.    On information and belief, cell checks of Dana A. Kitchin's cell were inadequate.  Log entries for cell checks were not made at the time of the check.  Dana A. Kitchin's cell was not checked to KCCF standards.

134.    Corrections officers have an obligation under KCCF standards to note unusual and significant concerns in the log entries.  The corrections officers failed to note any of the Decedent's cries for help or the condition of his cell in the log.  However, other unusual and significant concerns were cited in the log entries in the intake area involving other inmates.

135.    At all times on December 12, 2014 while cell checks were done, it was obvious and apparent that the Decedent required immediate emergency medical attention.  No such medical attention was provided to the Decedent by the corrections officers, supervisors or medical staff, until his death.

136.    KCCF requires that cell checks be done more frequently than is typical in the case of an inmate with a medical or mental health need.  The cell checks for the Decedent were inadequate.

137.    On information and belief, the Decedent began complaining of stomach pain and requesting help when he began having bowel control issues in his cell.

138.    KCCF staff and CHP medical staff never provided the Decedent medical attention on or about December 12, 2014 until after the Decedent's death.

139.    It is KCCF's policy that no employee ever refuse or hinder an inmate's right to medical services or care.  Moreover, KCCF employees, pursuant to KCCF policy, must give emergency medical care as promptly as possible.  On information and belief, the Decedent suffered from an emergency medical situation.

140.   As repeated above, the Decedent did everything he could to get the attention of the employees at the KCCF. Each time he complained, he was either ignored by KCCF staff and/or the KCCF did nothing to investigate the Decedent's obvious, emergency medical needs.

141.   KCCF requires that its corrections employees must remain constantly alert and ready to respond immediately to any emergency medical situation.

142.   KCCF requires that its corrections employees contact medical providers in the event of non-life threatening emergencies, and log their interaction with medical providers.

143.   The Decedent repeatedly complained of "stomach pain" and "heart-attack." He also complained he could not move, as the day progressed on December 12, 2014. None of these complaints by the Decedent were taken seriously by the KCCF and instead, were ignored. On information and belief, KCCF and CHP staff simply ignored the Decedent's obvious, emergency medical needs because they believed he was a nuisance.

144.   KCCF employees were required to medically assist the Decedent, regardless of whether the emergency medical needs were considered life threatening.

145.   CHP was hired to administer various medical services at the KCCF. CHP had a duty to provide adequate medical attention to the Decedent, which they did not do.

146.   CHP took over responsibilities for providing medical services at the KCCF on November 1, 2014. Prior to officially taking over responsibility of the medical operations at the KCCF, CHP was concerned that the KCCF was not a safe place and had sloppy procedures and inadequate supervision.

147.   CHP re-hired some of the medical staff, including Nurse Ulrich, from the previous company who was responsible for the medical care at the KCCF.

148.    CHP had an obligation to document all healthcare provided to an inmate.

149.    CHP created various rules and procedures for its employees to follow while working at the KCCF.

150.    On information and belief, there were three CHP employees working at the KCCF at the time the Decedent was incarcerated from December 10, 2014 to December 12, 2014.

151.    CHP nurses are expected to do rounds in the holding area each day. The nurse is required to open each inmate cell's door and speak to the inmate, to identify who they are and what their needs are. CHP nurses did not adequately do their rounds on December 11, 2014 or December 12, 2014, nor did they adequately provide medical care to the Decedent.

152.    On December 11th and December 12th, Nurse Ulrich was responsible for visiting each inmate that was housed in intake. Nurse Ulrich never did the checks in the intake area.

153.    On December 12th at approximately 11:38 am, Nurse Ulrich was seen walking by the Decedent's cell but never consulted with or had physical contact with the Decedent.

154.    During this period of time, the Decedent was crying for help and demanding to go to the hospital.

155.    Nurse Mulholland never checked to ensure the nurses she was supervising were doing the daily checks or following her instructions.

156.    On January 20, 2015, Captain Marsha Alexander informed CHP about Nurse Ulrich's failure to assist the Decedent. Captain Alexander informed CHP that the KCCF was very concerned with Nurse Ulrich's continued employment in the medical department. On information and belief, Nurse Ulrich was terminated shortly thereafter.

157.    On December 12, 2014, Nurse Ulrich found the Decedent lying on his back.  She felt for

a pulse and observed none.  She observed for respiration and observed none.  Despite this, Ulrich did not attempt CPR on Decedent.

158.    On information and belief, KCCF corrections officers were inadequately trained and supervised relative to the emergency medical needs of inmates.

159.    KCCF correction officers had a duty to provide first aid when confronted with an emergency medical situation, which they did not do.

160.    Captain Alexander was the Jail Administrator at the KCCF. Among her responsibilities, Captain Alexander was responsible to ensure all Correctional Employees receive training necessary to promote a working knowledge of administrative policies and procedures. This includes supervisory employees.

161.    According to KCCF policy, all new supervisory employees will be provided training in supervisory skills. At minimum, training will include:

  a.   Supervisory leadership skills.

  b.   Correctional law (as it pertains to Supervisors).

  c.   Principles of organization and management.

  d.   Personnel Supervision.

  e.   Employee discipline and counseling.

  f.   Supervisory responsibility in monitoring operational practices to ensure compliance with policies, procedures, and standards.

  g.   Completing employee performance appraisals.

  h.   Sexual Harassment/ Work Place Respect.

  i.   PREA reporting/ investigations

162.    Sgt. LaChance stated that there was no specialized training for SOIC, despite the fact there was at the time of the Decedent's incarceration at the KCCF a policy to provide such training.

163.    Captain Alexander was responsible for ensuring the appropriate training took place. That training did not occur.

164.    CHP was obligated to assist in medical related training of all new KCCF employees and assist in annual refresher training of corrections officers and supervisors.

165.    Krebs was the Chief Medical Officer of CHP and was also the supervising physician at the KCCF.

166.    On information and belief, Krebs was responsible for overseeing the CHP operations in the KCCF during the time frame giving rise to this cause of action.

167.    At the time of Decedent's incarceration and untimely death, the CHP medical staff at KCCF reported to Krebs.

168.    On information and belief, Krebs assisted in developing policies and procedures related to the healthcare of inmates and detainees at the time of Decedent's incarceration and untimely death.

169.    On information and belief, Krebs was required to regularly confer with Liberty, KCCF, KCCD or their agents concerning both existing healthcare procedures and any changes to those procedures at the time of Decedent's incarceration and untimely death.

170.    In the fall of 2014, Krebs informed CHP that he would be leaving the company. His last day of employment at CHP was December 22, 2014.

171.    Mix's official title was the Senior Medical Director at CHP at the time of Decedent's

death.

172.    The corrections officers and medical staff at the KCCF were aware that the Decedent repeatedly asked for medical help, yet they ignored him.

173.    Decedent's need for medical attention was obvious to all those who observed him at the KCCF during the time period described by Nickerson and Swift.

174.    The Decedent's conscious pain and suffering could have been cured by prompt medical attention.  Instead, the Decedent consciously and painfully bled to death internally over a period of many hours.

175.    On information and belief, the Defendants knew the Decedent suffered from mental illness.  Defendants Gardner, Letourneau, Robbins, Paine, Gagnon, Beale, Routhier, Morin, Bryant, LaChance and Nurse Ulrich ignored the Decedent's cries for help because they found him to be annoying and/or a nuisance.

176.    The Decedent was in excruciating pain, agony and mental anguish for many hours before his death.

177.    Liberty, Mason, the County, KCCF, KCSO, KCCD, the Commissioners and Captain Alexander were responsible for maintaining adequate staffing levels to ensure the safety of their prisoners or detainees.  That includes a responsibility that there be an appropriate number of properly trained and supervised staff on duty, including the medical staff, in each shift.  It also includes the responsibility to adequately supervise staff regarding inmate mental health issues.

178.    On information and belief, CHP, Krebs, Mix and Mulholland were responsible for training and supervising CHP employees while they were assigned to the KCCF.

179.    Defendants allowed conditions at the KCCF to deteriorate causing an environment where

inmate safety and health was disregarded.

180.   On information and belief, the KCCF audio and video surveillance system was not working properly at all times referenced in this Complaint.  The video system worked properly, but audio was not recorded.  The KCCF Defendants were aware that the audio system did not record audio, and they deliberately disregarded the malfunctioning of the system to the detriment of the safety and well-being of inmates and detainees.

181.   Three days after the Decedent's death, on December 17, 2014, the Maintenance Supervisor for the KCCF, wrote a letter to Captain Alexander of the KCCF indicating that the intake area was only picking up sound intermittently, primarily the slamming of doors.

182.   Plaintiffs allege on information and belief that Defendants, with deliberate indifference, gross negligence, and/or wanton disregard to the safety, security, and constitutional and statutory rights of the Decedent, maintained, enforced, tolerated, permitted, acquiesced in, and applied policies, practices, or customs and usages that caused the Decedent's death.  These policies, practices, or customs and usages, include:

   a.   Selecting, retaining, and assigning employees with demonstrable propensities for misconduct or negligence;

   b.   Failing to screen, hire, appoint, promote, train, supervise and discipline Defendant deputy sheriffs and medical staff who will enforce the laws and protect the constitutional rights of its detainees;

   c.   Failing to adequately train, supervise, and control the corrections officers and medical staff at the KCCF to deal with medical emergencies and the appropriate ways to handle detainees suffering from mental illness;

d.      Failing to enforce the provisions of the Constitution of the United States concerning the adequacy of medical care; and

e.      Failing to promulgate, distribute and enforce clear, consistent and reasonable policies concerning protocols for emergency medical treatment and the handling of difficult and problematic detainees, including detainees with mental illness issues.

183.    On information and belief, KCCF was investigated by the Maine Department of Corrections relative to the facts and factors surrounding Mr. Kitchin's death.   On or about December 30, 2014, the Department of Corrections cited the KCCF for their noncompliance with mandatory standards established by the State of Maine for county and municipal detention and corrections facilities.

184.    Numerous correctional officers and supervisors were disciplined related to their improper and illegal conduct causing the death of Decedent.

185.    Plaintiffs have been physically, mentally, emotionally, and financially injured and damaged as a proximate result of the Decedent's wrongful death, including, but not limited to, the loss of Decedent's familial relationships, consortium, comfort, protection, companionship, love, affection, solace, and moral support.  In addition to these damages, Plaintiffs are entitled to recover for the reasonable value of funeral and burial expenses.

186.    All of the individual Defendants were acting under color of law as employees or agents of the County, KCCF, KCSO, KCCD, and CHP.   Their acts or failure to provide medical treatment were committed with malice and/or reckless disregard to Decedent's constitutional rights under the Constitution of the United States.

187.    Defendants' failure to provide adequate medical care to the Decedent was the proximate

cause and actual cause of the Decedent's suffering and death.

188.    Defendants' deliberate indifference to the serious medical needs of Decedent resulted in his conscious suffering and untimely and wrongful death.

189.    As a result, Plaintiffs Danielle Kitchin and Dana B. Kitchin have lost the lifelong love and companionship of their father and have also suffered pecuniary and non-pecuniary damages.

## V.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. Section 1983
### Violation of the 8th and/or 14th Amendments - Failure to Provide Medical Care
### (Against All DEFENDANTS)

190.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

191.    42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress …

192.    Plaintiffs in this action are citizens of the United States and all Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

193.    The Decedent had a clearly established right under the Eighth Amendment and Fourteenth Amendments to be free from deliberate indifference to his known serious medical needs and to proper medical care while in custody.

194.    All Defendants to this claim, at all times relevant hereto, were acting under the color of state law.

195.    Defendants failed to provide the Decedent with appropriate medical care during his medical emergency.

196.    Defendants violated the Decedent's constitutionally protected rights by engaging in various acts, including, but not limited to:

a.      Failing to provide the Decedent adequate, timely treatment for injuries or medical conditions;

b.      Failing to medically clear the Decedent prior to placement in his cell;

c.      Failing to properly treat the Decedent while he was in pain and anguish;

d.      Failing to provide the Decedent with adequate emergency treatment;

e.      Failing to maintain life saving equipment in working order; and

f.      Failing to fully evaluate the Decedent when he was heard moaning and crying in pain from his cell for several hours.

197.    The Estate and Co-Personal Representatives claim damages as a survivors' action and claim as damages the loss of the Decedent's right to life and of the physical injuries, pain and emotional anguish and trauma he suffered prior to his death.

198.    Defendants violated their obligation to provide medical services pursuant to the Due Process Clause of the Fourteenth Amendment.

199.    Defendants had a substantive obligation not to treat detainees, like the Decedent, in a manner that reflects deliberate indifference toward a substantial risk of serious harm to health, or serious medical needs.   They did treat the Decedent with such deliberate indifference.

200.    Defendants were deliberately indifferent to Decedent's serious medical condition, which presented a sufficiently substantial risk of serious damage to future health.

201.    The Decedent's medical condition was such that a lay person would recognize a need for medical intervention.

202.    The Defendants were deliberately indifferent to the Decedent's health.  Such indifference was reckless and was easily preventable through immediate and adequate medical attention.

203.    The Defendants knew that the Decedent needed medical attention, yet they wantonly disregarded his medical needs.  Alternatively, the Defendants purposefully ignored the Decedent's medical needs.

204.    The Defendants' actions constituted a refusal to provide basic medical care to the Decedent.

205.    As a result of the Defendant's conduct and deliberate indifference to the serious medical, mental and physical health conditions and constitutional rights of the Decedent, he endured conscious pain and suffering, and Danielle Kitchin and Dana B. Kitchin suffered loss of society, comfort, companionship, solace, love, affection, and services of their father, incurred funeral and burial expenses, and continue to suffer these damages.

206.    Plaintiffs are entitled to and demand an award of reasonable attorney's fees and costs according to proof.

207.    Each individual Defendant acted recklessly or with callous indifference to the Decedent's mental and physical condition and constitutional rights and should be assessed punitive damages.

        WHEREFORE, Plaintiffs pray for relief as set forth below.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. Section 1983**
**Violation of the Fourteenth Amendment to the Constitution:**
**Failure to Adequately Staff and Supervise KCCF Staff**
**(Against  LIBERTY,  MASON, COUNTY, KCSO, KCSD, KCCF, COMMISSIONERS,**
**CHP, KREBS, MIX, ALEXANDER, MULHOLLAND and DEFENDANT DOES)**
**(Monell Claim)**

208.   Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

209.   42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress …

210.   Plaintiffs in this action are citizens of the United States and all Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

211.   All Defendants to this claim, at all times relevant hereto, were acting under the color of state law.

212.   Defendants maintained a policy, custom or practice of understaffing and/or inadequately staffing the KCCF with supervisory custody personnel.

213.   Defendants' policy, custom or practices of understaffing and/or inadequately staffing the KCCF with supervisory custody control was the moving force behind the violation of Decedent's constitutional rights.

214.   Defendants knew or should have known that the policy, custom or practice of understaffing or inadequately staffing the KCCF with properly trained supervisors and corrections officers would cause grievous injury and/or death to the Decedent in violation of the Decedent's constitutional rights.

215.   As a proximate result of the conduct of the Defendants, the Decedent, Danielle Kitchin and Dana B. Kitchin suffered personal injury, emotional distress, and pain and suffering and

incurred general damages for the deprivation of their constitutional rights.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. Section 1983
### Violation of the Fourteenth Amendment to the Constitution:
### Failure to Adequately Train KCCF Staff
### (Against LIBERTY, MASON, COUNTY, KCSO, KCSD, KCCF COMMISSIONERS,
### CHP, ALEXANDER, MULHOLLAND, KREBS, MIX and DEFENDANT DOES)
### (Monell Claim)

216.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully

set forth herein.

217.    42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or
> usage of any state or territory or the District of Columbia subjects or causes to be
> subjected any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges or immunities secured by the
> constitution and law shall be liable to the party injured in an action at law, suit in
> equity, or other appropriate proceeding for redress …

218.    Plaintiffs in this action are citizens of the United States and all Defendants to this claim

are persons for purposes of 42 U.S.C. § 1983.

219.    All Defendants to this claim, at all times relevant hereto, were acting under the color of

state law.

220.    Defendants maintained a policy, custom or practice of understaffing and/or inadequately

staffing the KCCF with sufficiently trained custody and medical personnel.

221.    Defendants' policy, custom or practices of understaffing and/or inadequate staffing the

KCCF with sufficiently trained custody and medical personnel was the moving force behind the

violation of the Decedent's constitutional rights.

222.    Defendants failed to properly train custody and medical personnel as to the care and

treatment of mentally ill prisoners and the provision of medical care for prisoners.

223.    Defendants knew or should have known that the policy, custom or practice of failing to adequately train KCCF staff would cause grievous injury to the Decedent in violation of the Decedent's constitutional rights.

224.    As a proximate result of the conduct of Defendants, the Decedent, Danielle Kitchin and Dana B. Kitchin suffered personal injury and emotional distress and incurred general damages for the deprivation of their constitutional rights.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. Section 1983**
**Violation of the Fourteenth Amendment to the Constitution**
**Policy Denying Appropriate Medical Care**
**(Against  LIBERTY, MASON, COUNTY, KCSO, KCSD, KCCF COMMISSIONERS,**
**CHP, ALEXANDER, MULHOLLAND, KREBS, MIX and DEFENDANT DOES)**

225.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

226.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress …

227.    Plaintiffs in this action are citizens of the United States and all Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

228.    All Defendants to this claim, at all times relevant hereto, were acting under the color of state law.

229.    Defendants maintained a policy, custom or practice of understaffing and/or inadequately staffing the KCCF with properly trained and supervised medical staff.

230.    Defendants maintained a policy, custom or practice of denying prisoners access to emergency medical care.

231.    Defendants maintained a policy, custom or practice of failing to ensure that emergency transportation was available if needed.

232.    Defendants' policies, customs or practices of understaffing and/or inadequate staffing and failing to properly supervise the medical staff, failing to provide access to care, and failing to provide lifesaving treatment and transportation was the moving force behind the violation of the Decedent's constitutional rights.

233.    Defendants knew or should have known that these policies, customs or practices would cause grievous injury to the Decedent in violation of his constitutional rights.

234.    As a proximate result of the conduct of Defendants, the Decedent, Danielle Kitchin and Dana B. Kitchin suffered personal injury and emotional distress and incurred general damages for the deprivation of their constitutional rights.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**FIFTH CLAIM FOR RELIEF**
**Negligent Supervision, Retention and Training**
**(Against CHP)**

235.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

236.    CHP owed a duty to Decedent to not cause him harm.

237.    CHP was required to train CHP staff and KCCF staff on providing medical services at the KCCF.

238.    CHP breached these duty by, *inter alia*, negligently training, retaining, and supervising CHP employees and KCCF staff.

239.    The acts and conduct of CHP employees and KCCF staff  were the direct and proximate cause of death to the Decedent and violated the Decedent's statutory and common law rights as guaranteed by the laws and Constitution of the United States and Constitution of the State of Maine.

240.    CHP's negligent supervision, retention and training as described in the preceding paragraphs and in this Court caused the severe, emotional distress prior to the death of the Decedent and the death of the Decedent, for which the Plaintiffs should be compensated. Litigation costs and attorney fees should be awarded. CHP is vicariously liable.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### SIXTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
### (Against GARDNER, LETOURNEAU, ROBBINS, PAINE, GAGNON, BEALE, ROUTHIER, MORIN, BRYANT AND LACHANCE)

241.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

242.    Defendants intentionally or recklessly failing to provide medical care to the Decedent, despite Decedent's persistent pleas for help was extreme, outrageous and utterly intolerable in a civilized community; conduct which exceeded all reasonable bounds of decency and caused severe emotional distress of the Decedent prior to his death.

243.    Defendants intentionally or recklessly failed to clean the Decedent's cell, despite the fact

that the Defendants were aware that the cell and cell window were covered in feces and blood, which was extreme, outrageous and utterly intolerable in a civilized community; conduct which exceeded all reasonable bounds of decency and caused severe emotional distress of the Decedent prior to his death.

244.    The failure to provide medical care and clean the Decedent's cell was the direct and proximate result of the Decedent's emotional distress prior to his death.

245.    No reasonable person could have expected to endure the emotional distress the Decedent endured as he bled internally from his ruptured spleen, crying for help in a feces and blood covered cell.

246.    The Defendant's conduct as described in this Complaint caused the Decedent to be injured by way of pain and suffering and emotional distress, for which Plaintiffs should be compensated.

    WHEREFORE, Plaintiffs pray for relief as set forth below.

## SEVENTH CLAIM FOR RELIEF
### Survivor Claims
### 18-A M.R.S.A.  § 3-817
### (Against LIBERTY, MASON, COUNTY, KCSO, KCSD, KCCF COMMISSIONERS, GARDNER, LETOURNEAU, ROBBINS, PAINE, GAGNON, BEALE, ROUTHIER, MORIN, BRYANT, LACHANCE AND CHP)

247.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

248.    Plaintiffs are entitled to bring this action and recover damages under Maine's survival statute (18-A M.R.S.A.  §3-817) for deprivation of the Decedent's civil rights.

249.    The deprivation of the Decedent's civil rights caused him pre-death suffering, injuries, mental and physical anguish and emotional distress, all caused by Defendants' actions.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## EIGHTH CLAIM FOR RELIEF
### Respondeat Superior Liability
### (Against CHP)

250.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

251.    The conduct of CHP employees alleged herein occurred during the course and scope of their duties and functions as medical staff and while acting as an agent, officer, contractor, servant and/or employee of CHP.

252.    As a result, CHP is liable to Plaintiffs pursuant to the common law doctrine of respondeat superior.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## NINTH CLAIM FOR RELIEF
### Violation of Title II of the Americans With Disabilities Act
### (Against LIBERTY, MASON, COUNTY, KCSO, KCSD, KCCF, COMMISSIONERS)

253.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

254.    Title II of the Americans With Disabilities Act (*hereinafter* "ADA") (42 USC §12132 et seq.) prohibits State and local entities, including the Defendants, from discriminating against individuals with disabilities in the provision of programs, services, or activities.

255.    Title II of the ADA (42 USC §12132 et seq.) requires that the Defendants must make reasonable accommodations to its programs, services, and/or activities for individuals with disabilities to ensure that individuals with disabilities can equally effectively participate in the programs, services or activities of the KCCF.

256.    Medical care qualifies as one of the "programs, services and/or activities" under Title II of the ADA.

257.    Defendants are public entities as that term is defined in 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

258.    The Decedent was an individual with a disability as defined by Title II of the ADA.

259.    The Defendants failed to make reasonable accommodations for the Decedent to allow him to effectively participate in KCCF programs, activities, or services. Such failures include, without limitation, failure to conduct a needs assessment when KCCF learned about the Decedent's disability, failure to provide prescribed medication, failure to provide medical care to the Decedent upon notice of disability and failure to conduct ongoing needs assessment to ensure that the Decedent's disability related needs were being met.

260.    The Defendants violated the Decedent's rights under Title II of the ADA.

261.    As a direct and proximate result of the Defendants' actions, the Decedent suffered  severe and debilitating emotional distress and death.

        WHEREFORE, Plaintiffs pray for relief as set forth below.

**TENTH CLAIM FOR RELIEF**
**Supervisory Liability for Violation of Americans With Disabilities Act**
**(Against LIBERTY, MASON, COUNTY, KCSO, KCSD, KCCF, COMMISSIONERS)**

262.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as though fully set forth herein.

263.    Defendant Liberty was the Sheriff of Kennebec County at the time of the Decedent's death and was in charge of administering and training all staff, corrections officers and Defendant Does at KCCF.

264.    Defendant Mason is currently the Sheriff of the County and is in charge of administering and training all staff, corrections officers and Defendant Does at KCCF.

265.    Defendants County, KCCF, KCSO, KCCD, Commissioners, Crockett, Rines and Jabar, were in charge of administering and training all staff, corrections officers and Defendant Does at KCCF.

266.    The Defendants failed to ensure that CHP employees and KCCF staff were properly trained in the requirements of the ADA.

267.    The Defendants failed to properly supervise CHP employees and KCCF staff to ensure that CHP employees and KCCF staff comply with the provisions of the Act.

268.    As a direct and proximate result of Defendants' failure, Defendants violated Decedent's rights under the ADA.

269.    As a direct and proximate result of the Defendants' actions, the Decedent suffered severe and debilitating emotional distress and death.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.  For general and compensatory damages;

2.  For special and treble damages according to proof;

3.  For punitive damages against the appropriate Defendants;

4.  For funeral and burial expenses according to proof;

5.  For damages for future lost earnings and lost earnings capacity according to proof;

6.   For other losses in an amount according to proof;

7.   For costs of suit;

8.   For attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and as otherwise authorized by statute or law;

9.   For such other relief as the Court deems proper.

## VII.   JURY DEMAND

Plaintiffs hereby demand a jury trial.

Dated this 1st  day of August, 2019 in Portland, Maine.

Respectfully Submitted,                    Respectfully Submitted,

/s/ Timothy E. Zerillo, Esq.               /s/ John M. Burke, Esq.
ME Bar No. 9108                            ME Bar No. 4787
Attorney for Plaintiffs                    Attorney for Plaintiffs
Zerillo Law Firm, LLC                      Caseiro Burke LLC
1250 Forest Ave, Ste 3A                    One Union Street, Suite 400
Portland, ME 04103                         Portland, ME 04101
207-228-1139                               207-219-8418
tim@zerillolaw.com                         jburke@caseiroburke.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| DANIELLE KITCHIN and DANA B. KITCHIN, Co-Personal Representatives and heirs of the ESTATE OF DANA A. KITCHIN,<br><br>Plaintiffs,<br><br>v.<br><br>RANDALL LIBERTY, et. al.<br><br>Defendants. | **Docket No.**<br>**1:18-cv-00356-JDL** |

**CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2019, I electronically filed the PLAINTIFFS' SECOND AMENDED COMPLAINT with the Clerk of Court using the CM/ECF system. Notice of this filing has been sent by operation of the Court's CM/ECF system to all parties that have appeared in this matter. All parties that have not appeared in this matter will be served in accordance with the Federal Rules of Civil Procedure.

Respectfully Submitted,

/s/ John M. Burke, Esq.
ME Bar No. 4787
Attorney for Plaintiffs
Caseiro Burke LLC
One Union Street, Suite 400
Portland, ME 04101
207-219-8418
jburke@caseiroburke.com